IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

BEN ROOD,

          Plaintiff,

     vs.                               Civil Action No. 2:17-cv-01223

R&R EXPRESS, INC,

          Defendant.

**DEFENDANT'S OMNIBUS MEMORANDUM IN SUPPORT OF MOTION TO DECERTIFY FLSA COLLECTIVE AND RULE 23 CLASS, MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT IN FAVOR OF DEFENDANT, AND MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

# <u>TABLE OF CONTENTS</u>

**Page**

I.    STATEMENT OF MATERIAL FACTS ...........................................................................1

II.   ARGUMENT ..................................................................................................................6

    A.    The FLSA collective and the Rule 23 class do not meet the numerosity requirement.  Accordingly, the collective action FLSA claims and the Rule 23 class should be dismissed as a matter of law. ......................................................6

        i.    The Court should consider only the three opt-ins in terms of assessing the FLSA class size which fails to meet the numerosity requirement as a matter of law. ...................................................................6

        ii.    The Rule 23 proposed class is insufficiently sized to establish numerosity on Plaintiff's state law claims. ...................................................8

    B.    Logistics coordinators fall under the administrative employee exemption, and therefore, are exempt from the FLSA overtime requirements. ........................8

        i.    Logistics Coordinators' primary duty is to perform non-manual office work directly related to the general business operations of R&R. ..............................................................................................................9

        ii.    Logistics coordinators exercise discretion and independent judgment with respect to matters of significance. ....................................13

        iii.    Logistics coordinators' compensation exceeded $455.00 per week and should be viewed as compensation on a "salary basis." ....................17

            a.    Logistics coordinators' pay exceeded $455.00 per week. ............17

            b.    Logistics Coordinator's compensation schedule was intended to reflect a minimum salary, and in practice, resulted in Logistics Coordinators being compensated in excess of the $455.00 per week. ...................................................19

        iv.    Judgment in favor of R&R and against Ben Rood is proper. ...................20

        v.    The Logistics Coordinator Handbook is not a relevant consideration. .............................................................................................21

    C.    Logistics coordinators fall within the retail or service establishment exception. ..................................................................................................................22

        i.    R&R is a retail or service establishment. ................................................23

        ii.     Compensation to logistics coordinators exceeds 1 ½ times the federal minimum wage. ..............................................................................25

        iii.    More than half of the employee's compensation for a representative period represents commissions on services. ......................26

D.     R&R exhibited a good faith effort to comply with the FLSA. ............................26

E.     Treating logistics coordinators as exempt is consistent with the FLSA's structure and broader purposes. ...........................................................................27

III.    CONCLUSION ............................................................................................................29

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Baudin v.Courtesy Litho Arts, Inc.*,
24 F.Supp.2d 887 (N.D. Ill. 1998) ....................................................... 21

*Brennan v. Deel Motors*,
475 F.2d 1095 (5th Cir. 1973) ....................................................... 27, 28

*Christopher v. SmithKline Beecham*,
567 U.S. 142 (2012)....................................................... 27, 28

*Cox v. Am. Cast Iron Pipe Co.*,
784 F.2d 1546 (3rd Cir. 1986) ....................................................... 7

*Davis v. City of Hollywood*, 120 F.3d 1178 (11th Cir. 1997) ....................................................... 20

*Encino Motorcars, LLC v. Navarro*,
138 S. Ct. 1134 (2018)....................................................... 16, 23

*Flood v. Just Energy Marketing Corp.*, 904 F.3d 219 (2nd Cir. 2018)....................................................... 12

*Grayson v. 7-Eleven, Inc.*,
2013 WL 1187010 (S.D. Cal. March 12, 2013)....................................................... 7

*Halle v. West Penn Allegheny Health System Inc.*,
842 F.3d 215 (3rd Cir. 2016) ....................................................... 6, 7

*Hofer v. Federal Cartridge Corp.*,
71 F. Supp. 243 (D. Minn. 1947)....................................................... 17

*In re Modafinil Antitrust Litigation*,
837 F.3d 238 (3rd Cir. 2016) ....................................................... 7

*Martin v. Cooper Electric Supply Co.*,
940 F.2d 896 (3rd Cir. 1991) ....................................................... 12, 13

*McKeen-Chaplin v. Provident Savings Bank*, 862 F.3d 847 (9th Cir. 2017)....................................................... 12

*Morgan v. Family Dollar*,
551 F.3d 1233 (11th Cir. 2008) ....................................................... 7

*Reiseck v. Universal Communications of Miami, Inc.*, 591 F.3d 101 (2nd Cir. 2010) ....................................................... 12

*Riojas v. Seal Produce, Inc.*,
    82 F.R.D. 613 (S.D. Texas 1979) ........................................................ 6

*Robinson-Smith v. Government Employees Ins. Co.*,
    323 F.Supp.2d 12, *reversed and remanded on other grounds* 590 F.3d 886
    (D.C. 2010) ......................................................................................... 21

*Smith v. Johnson and Johnson*,
    593 F.3d 280 (3d Cir. 2010) .......................................................... 11, 12

*Smith v. T-Mobile USA, Inc.*,
    570 F.3d 1119 (9th Cir. 2009) ............................................................. 7

*Sturgeon v. Frost*,
    136 S. Ct. 1061 (2016) ....................................................................... 27

*Taniguchi v. Kan Pacific Saipan, Ltd.*,
    566 U.S. 560 (2012) ........................................................................... 16

*Verkuilen v. Mediabank, LLC*,
    646 F.3d 979 (7th Cir. 2011) ........................................................ 13, 14

*Wal-Mart Stores, Inc. v. Dukes*,
    564 U.S. 338 (2011) ........................................................................... 21

*Webb v. Exxon Mobil Corp.*,
    856 F.3d 1150 (8th Cir. 2017) ............................................................. 7

*Williams v. Tri-County Growers, Inc.*,
    747 F.2d 121 (3rd Cir. 1984) ............................................................. 26

## **Statutes**

15 U.S.C. § 2051 ...................................................................................... 19

15 U.S.C. § 2052 ...................................................................................... 19

29 U.S.C. § 207 .................................................................................. 9, 26

29 U.S.C. § 213 ............................................................................. 9, 10, 32

29 U.S.C. § 216 ........................................................................................ 6

29 U.S.C. § 260 ...................................................................................... 30

29 U.S.C.A. § 202 .................................................................................... 9

43 P.S. § 333.105(a)(5) ........................................................................... 10

iv

## Other Authorities

Fed. R. Civ. P. 23 ................................................................................................ 6, 7

## Rules

29 C.F.R. § 541.2 ............................................................................................ 9, 21

29 C.F.R. § 541.200 ............................................................................................. 9

29 C.F.R. § 541.201 ....................................................................................... 10, 14

29 C.F.R. § 541.202 ............................................................................................ 13

29 C.F.R. § 541.3 ............................................................................................... 10

29 C.F.R. § 541.602 ................................................................................ 18, 20, 21

29 C.F.R. § 541.603 ............................................................................................ 21

29 C.F.R. § 541.700 ............................................................................................. 9

29 C.F.R. § 779.313 ............................................................................................ 22

29 C.F.R. § 779.318 ............................................................................................ 24

## Regulations

5 James WM. Moore, et. al., Moore's Federal Practice § 23.22 .................................... 7

5 William B. Rubenstein, Newberg on Class Actions § 3:12 ...................................... 7

DOL Opinion Letter dated August 31, 2020 ............................................................. 23

DOL Opinion Letter FLSA 2021-6 dated January 19, 2021 ....................................... 24

https://en.oxforddictionaries.com/definition/coordinator ............................................ 16

https://en.oxforddictionaries.com/definition/logistics ................................................ 16

S. Rep. No. 75-774 ............................................................................................. 28

S. Rep. No. 75-884 ............................................................................................. 28

## I.      INTRODUCTION

Defendant R&R Express, Inc. ("R&R"), by its undersigned counsel, respectfully submits this Omnibus Motion to Decertify FLSA Collective and Rule 23 Class, Memorandum of Law in Support of Motion for Summary Judgment in Favor of Defendant and Memorandum of Law in Opposition to Plaintiff's Motion for Summary Judgment. For the reasons set forth below, R&R requests this Court decertify the class. Alternatively, R&R requests that this Court conclude that logistics coordinators were exempt employees under the Fair Labor Standard Act ("FLSA") as a matter of law and grant summary judgment in favor of R&R.

In his Complaint, Plaintiff Ben Rood ("Mr. Rood") alleges that R&R violated the FLSA's overtime provisions.  This Court has certified a class to include all individuals who worked from September 19, 2014 to December 31, 2017 as logistics coordinators.  For the reasons set forth below, the FLSA collective and Rule 23 class should be decertified.   Further, R&R properly categorized its logistics coordinators as exempt employees under the administrative employee exemption.  Alternatively, R&R's logistics coordinators are exempt pursuant to the retail or service exemption.

## I.      <u>STATEMENT OF MATERIAL FACTS</u>

R&R is a Pittsburgh-based leader of transportation and logistics services. *See* Declaration of Richard Francis appended hereto as Exhibit A and previously filed with Defendant's Memorandum of Law in Opposition to Conditional Certification at Doc. No. 60-1.  Throughout its thirty-year history, R&R has dedicated itself to becoming the best in the logistics industry, focusing on providing efficient and cost-effective solutions to meet its customers' transportation needs.  *See id.* R&R and its affiliated entities employ over 135 employees in the Pittsburgh region. Doc. No. 140-1, at p. 40.  R&R prides itself on fostering an employee centric company culture.

R&R's efforts in this regard are well recognized.[1]  R&R's employees can be categorized into various departments: billing, collections, information technology, accounting, and logistic coordinators.  *See* Exhibit A.  Employees in R&R's billing, collections, IT, and accounting departments are either salaried employees, or employees who are paid overtime when overtime is incurred.  *Id.*  This litigation focuses on a small facet of R&R's employees, logistics coordinators.[2]

Historically, transportation companies, like R&R, used third-party logistics companies ("3PL") to provide logistics services that are an ancillary, but a necessary part of the transportation process.  *See* Doc. No. 140-1 at pp. 47-48.  3PL includes assuming the responsibility for moving a customer's product through the supply chain to the end destination.  Exhibit A.  As part of its evolution, R&R, in 2014, developed in-house 3PL capabilities.  *Id.*  R&R provides 3PL services through a team of logistics coordinators who use a proprietary suite of systems and technologies to supply customers with unparalleled centralized visibility and control of their loads.  Doc. No. 140-1 at pp. 164-165.

Logistics coordinators operate independently, free from any supervision or direction regarding any aspect of their day to day duties.  Exhibit A.  Logistics coordinators work autonomously, with no supervisory oversight.  Exhibit A. They develop and manage their own business plans.  Doc. No. 140-1 at p. 93.  They build their own contacts and decide whom to identify and contact – at both ends of the supply chain – to develop their book of business.  Exhibit A.  They select the services and resources they decide are appropriate for the solution they design for the customers' individualized need.  They alone negotiate price and terms with both shippers

---

[1]  R&R employees share the industry's view of their employer.  Notably, the Pittsburgh Business Times selected R&R each of the last three years as the winner of the "Best Places to Work" (large category) based on feedback provided to it by R&R's employees.  *See*, Richard Cerilli, "Best Places to Work category winner: R&R Express foregoes foosball, focuses on more traditional values."  *Pittsburgh Business Times*, Oct. 19, 2018.
[2]  R&R employed two logistics coordinators in 2014, four in 2015, twelve in 2016 and eighteen in 2017.  *See* Doc. Nos. 140-15 to 140-18.

and transportation companies.  Doc. No. 140-1 at pp. 93, 213, 218; Exhibit A. Once the customers'

product is in motion, the logistics coordinators track the load throughout the logistics and

transportation process.  *Id.*  They intervene when problems arise serving as the customer's

decision-maker.  *Id.*

The primary duty of logistics coordinators, as the name suggests, is coordination between

shippers and transporters and acting as a consultant to customers with shipping needs.  Doc. No.

140-8 at pp. 62, 63-65; Doc. No. 140-10 at 45, 53-54, 57; and Doc. No. 140-02 at pp. 84 -86.[3]

Logistics coordinators use a host of ever-changing resources to coordinate door-to-door movement

of customer's loads.  *Id.*; *see also* Doc. No. 140-1 at p. 85.  Such resources vary from load-to-load,

but may include truck, rail or ship transportation services along with drayage,[4] and warehousing

service where needed. Exhibit A. Once trained, logistics coordinators work autonomously and do

not require supervisor approval to (1) pursue business within a particular industry or geographic

area, (2) negotiate price or cost of service, (3) select the mode or resource required to fill a

particular transportation need; (4) negotiate rates with the carrier, container line or railroad on

behalf of R&R and their customers; or (5) to combine different customer's LTL shipments into a

single TL shipment.[5] Doc. No. 140-1 at pp. 93, 213, 218; Exhibit A.  Logistics coordinators are

free to choose the type of work they want to pursue.  Doc. No. 140-1 at p. 93.  Some logistics

coordinators coordinate high volume loads with smaller, steadier margin freight.  Exhibit A.

Others focus on higher valued goods, for which shippers are less sensitive to price, and produce

higher margins.  *Id.*  Logistics coordinators possess wide and total discretion regarding every

---

[3] Logistics coordinators do not perform manual labor, they do not work on a production line, they do not produce a product, they do not sell a product, and they do not perform repetitive operations with their hands.  Exhibit B.
[4] Drayage is an industry term used to describe the transportation of goods over a short distance – often as part of a longer overall move.  *See,* Doc No. 140-1 at pp. 35, lines 20-25 and 26, lines 1-25.
[5] LTL is an industry term of art meaning "Less Than a Truck Load".  Utilizing LTL capabilities, LCs are able to combine small load movements in a single truck thereby creating a transportation solution for the shipper and creating value by spreading the cost of the service among several shippers.  Doc. No. 140-1 at p. 32.

aspect of their duties, assuming responsibility for the hours each chooses to work and possessing the ability to impact on the pay they earn. *Id.; see also* Doc. No. 140-26 at pp. 76-77.  Logistics coordinators work with complete autonomy, functioning essentially as businesses within R&R's business.  Exhibit A.  Several former logistics coordinators have developed their own businesses, transitioning to a non-exclusive independent contractor relationship with R&R.

While R&R has no set start or end-point for training logistics coordinators, it uses 90-days as an internal reference point, anticipating that a trainee will fully learn to function and perform within that time.  Exhibit A.  In practice, however, whether before or after the 90-day period, the training transition point is variable.  *Id.*  R&R determines the transition point for each trainee by measuring the commission a trainee would earn against his $800 weekly salary.  Doc. No. 140-1, pp. 73-74; Exhibit A.  When the former exceeds the latter, on a substantial and consistent basis, R&R deems the logistics coordinators to have the skill set required to perform independently and successfully.  *See id.*  R&R has never forced a trainee off his $800 a week salary at the end of the 90-day period.  Exhibit B, Declaration of Richard Francis.  Rather, R&R continues to pay the trainee $800 per week until they reach the transition point.  Unlike logistics coordinators who have no set hours, trainees are required to arrive to work by 8 a.m. with their workday ending at 5 p.m.[6] Doc. No. 140-1, p. 71.  R&R's commissions are generally calculated between twenty and forty percent of the profit margin earned on the subject 3PL work.[7]  Exhibit A.  Because they exist at the center of the shipper/carrier relationship, logistics coordinators can control to a degree earned commissions by capturing the highest profit margin for a particular 3PL engagement.  Some

---

[6]  Within that period, R&R provides trainees with breaks in the morning, afternoon and for lunch.  Doc. No. 140-1, p. 102.
[7]  R&R typically pays logistics coordinators a thirty-five percent commission of the captured profit margin.  Where logistics coordinators share responsibility for a particular engagement, R&R splits the subject commission between them**.**

logistics coordinators earn commissions as high as fifty percent.  Exhibit B.  All have unlimited commission earning potential.

The logistics coordinators at issue in this case were employed from September 19, 2014 to December 31, 2017.  The payroll records for the relevant period have been introduced as exhibits in this case.  Doc. Nos. 140-15 to 140-18 (filed under seal at Doc. No. 142-5 to 142-7). These payroll records reflect payment to twenty-six individuals. *See id.* Only three individuals have opted-in to the FLSA collective: Ben Rood, Jonathan Zehe and David Miller. Doc. Nos. 76, 80, and 81. Further, ten individuals have opted-out of the Rule 23 class action premised on the Pennsylvania Minimum Wage Act.  Doc. No. 132 (Notice of Filing of Opt-Outs). Nine of the individuals who have opted-out are reflected in the payroll logs. *See* Doc. No. 132 (Notice of Filing of Opt-Outs); Doc. Nos. 140-15 to 140-18.[8] Those individuals are: Maxwell Curley, Bryan Jackson, John Krakowski, Robert Larimer, Shawn Laverty, Josh Rulnick, Ben Shelton, Thomas Stinson and Jason Ryan Teitz. *Id.*  A late opt-out was filed by Jason Kneller. Doc. No.136.

As is reflected in the payroll records, all logistics coordinators were paid a minimum of $455.00 during 2014. Doc. No. 140-15.  The following individuals were at all times paid in excess of $455.00 per week: Naggy, Tressler, Delesandro, Miller, Terrick, Zangaro, Hall, Szlachta, Thuer, Vasquez, and Kehr.  *See* Doc. Nos. 140-15 to 140-18.  Additionally, several logistics coordinators did not move from the $800.00 pay structure described above and/or several logistics coordinators at all times made a weekly salary in excess of $800.00.  These individuals are: Curley,[9] Zangaro,

---

[8] Plaintiff sent notices to thirty-one individuals. However, an examination of the payroll records confirms that several individuals who received notice did not work as a logistics coordinator during the relevant period. These individuals are: Chris Craft, Dave Dalesandro, Micahel Szlachta, David Terrick, and Devin Zangaro. *See* Doc Nos. 140-15 to 140-18. Further, Alex Naggy is deceased and Jason Kneller has filed a late opt-out. Doc. No. 136.
[9] Mr. Curley was employed in 2017. He was paid a salary of $650.00 per week. *See* Doc. No. 140-18.

Vasquez, Tressler, Thuer, Shelton, Sickenberger, Stinson, Rulnick, Naggy, Laverty, Krakowski, Hall.  *See* Doc. Nos. 140-15 to 140-18.

## II.      ARGUMENT

**A.      The FLSA collective and the Rule 23 class do not meet the numerosity requirement. Accordingly, the collective action FLSA claims and the Rule 23 class should be dismissed as a matter of law.**

        **i.      The Court should consider only the three opt-ins in terms of assessing the FLSA class size which fails to meet the numerosity requirement as a matter of law.**

This Court certified the FLSA collective action as all logistics coordinators who worked from September 19, 2014 through December 31, 2017.  Doc. No. 120.  Here, only three individuals have elected to opt-in to the FLSA collective action, Ben Rood, Jonathan Zehe and David Miller.  Doc. Nos. 76, 80, and 81.[10]

In assessing the size of the collective action, the Court is constrained to consider only the three opt-in plaintiffs.  This is because, unlike class actions brought solely pursuant to Federal Rule of Civil Procedure 23, *collective actions brought pursuant to the FLSA require an affirmative opt-in*.  29 U.S.C. § 216(b) ("No employee shall be a party plaintiff to any such action unless he gives his consent in writing to become such a party and such consent is filed in the court in which such action is brought.").[11]  In *Halle v. West Penn Allegheny Health System Inc.*, 842 F.3d 215 (3rd Cir. 2016), the Third Circuit offered a fulsome analysis of the distinctions between an FLSA collective action and a Rule 23 class action, and the pitfalls associated with viewing the two mechanisms conterminously.  The Third Circuit noted that:

> When a named plaintiff files a complaint containing FLSA collective action allegations, the mere presence of the allegations does not automatically give rise to the kind of aggregate litigation

---

[10] For the reasons set forth more fully below, the three opt-in plaintiff's should be excluded from the class based on the facts associated with their employment.

[11] *See also Riojas v. Seal Produce, Inc.*, 82 F.R.D. 613 (S.D. Texas 1979) ("To be a member of such class, Section 216(b) requires that a person must 'opt-into' the proceeding.").

> provided for in Rule 23.  Rather, the existence of a collective action depends upon the affirmative participation of opt-in plaintiffs.

*Id.* citing *Smith v. T-Mobile USA, Inc.*, 570 F.3d 1119, 1121 (9th Cir. 2009); *Morgan v. Family Dollar*, 551 F.3d 1233, 1259 (11th Cir. 2008).  The Third Circuit further emphasized that the opt-in requirement "mandating that each individual must file an affirmative consent to join the collective action- is the most conspicuous difference between the FLSA collective action device and a class action under Rule 23."  *Halle*, *supra.*

Class sizes of less than twenty members, including the class at issue in this matter, are insufficiently numerous.  *See, generally*, 5 James WM. Moore, et. al., Moore's Federal Practice § 23.22; *see also* 5 William B. Rubenstein, Newberg on Class Actions § 3:12; *Cox v. Am. Cast Iron Pipe Co.*, 784 F.2d 1546, 1553 (3rd Cir. 1986) (citing Moore favorably); *In re Modafinil Antitrust Litigation*, 837 F.3d 238 (3rd Cir. 2016) (also citing Moore favorably).[12]  Here, only three individuals have opted-in to the FLSA collective action.  This number is patently insufficient to sustain a collective action under the FLSA.  Accordingly, the Court should enter an order decertifying the class and granting summary judgment to Defendants, as a matter of law.  *See* Fed. R. Civ. P. 23(c)(1)(C) ("An order that grants or denies class certification may be altered or amended before final judgment."); *see also Webb v. Exxon Mobil Corp.*, 856 F.3d 1150 (8th Cir. 2017) (district court certified the class, but decertified the class on motion to decertify and motion for summary judgment, the Eighth Circuit affirmed); *Grayson v. 7-Eleven, Inc.*, 2013 WL 1187010 (S.D. Cal. March 12, 2013) (class was certified and decertified when both parties moved for summary judgment, it was later recertified without opposition).

---

[12]  Defendant incorporates its arguments set forth in Defendants Memorandum of Law in Opposition to Plaintiff's Motion for Rule 23 Class Certification and Final Certification Under the Fair Labor Standard Act as if set forth more fully herein.

ii.    **The Rule 23 proposed class is insufficiently sized to establish numerosity on Plaintiff's state law claims.**

Plaintiff has also asserted claims under the Pennsylvania Minimum Wage Act. ("PMWA") To the extent that the Court does not relinquish jurisdiction over these state law claims, in light of dismissal of the federal FLSA action for the reasons set forth above, then judgment on the PMWA proposed class action is also proper for failure to establish numerosity. The PMWA state law claims would be assessed based on the number of putative class members, minus any opt-outs. With ten opt-outs (nine timely, one untimely) the putative class of members for the state law claims is *at most* seventeen (twenty-six logistics coordinators minus nine opt-outs). However, R&R respectfully requests that the Court view the late opt-out as timely, bringing the number to sixteen class members. For the reasons set forth above, both sixteen and seventeen are numbers that are insufficiently numerous to establish numerosity under Rule 23 and pursuant to Pennsylvania law.

**B.**    **Logistics coordinators fall under the administrative employee exemption, and therefore, are exempt from the FLSA overtime requirements.**

Under the FLSA, employees who work more than forty hours per week are entitled to overtime pay unless they fall within one of the FLSA exemptions. 29 U.S.C. §§ 207, 213. The FLSA was enacted to eliminate "labor conditions detrimental to the maintenance of the minimum standard of living necessary for health, efficiency, and general well-being of workers." 29 U.S.C.A. § 202(a). It is within that relatively narrow lens of maintaining a "minimum standard of living" that this case must be viewed. This point is critically important in this case where the logistics coordinators were highly compensated. The highest compensated logistics coordinator earned $506,423.22 in 2017 and many other logistics coordinators earned well into the six figures. *See* Doc. No. 140-18.

R&R's Logistics coordinators unquestionably fall within the exemption applied to administrative employees. Under the administrative employee exemption, "anyone employed in

a bona fide administrative capacity is exempt from the FLSA's overtime requirements." 29 U.S.C. § 213(a)(1).[13]   An administrative employee is defined as someone who: (1) is compensated on a salary or fee basis of not less than $455.00 per week; (2) whose primary duty is the performance of office or non-manual work directly related to management or general business operations of the employer or the employer's customers; (3) whose primary duty includes the exercise of discretion and independent judgment with respect to matters of significance.   29 C.F.R. § 541.200.   An employee's specific job duties and salary must meet each of the requirements to qualify for the exemption.  *See*, *e.g*., 29 C.F.R. 541.2.  Importantly, job title alone is insufficient for purposes of determining whether an exemption applies as the court must look at each "particular employee" to determine whether their salary and duties meet the requirements of the exemption.   29 C.F.R. § 541.2 ("The exempt or nonexempt status of *any particular employee* must be determined on the basis of whether the employee's *salary and duties* meet the requirements of the regulations." (Emphasis added)).  Plaintiff's counsel asked the court to make a blanket determination as to the non-exempt status of logistics coordinators.  However, this analysis runs afoul to interpretative regulation 29 C.F.R. § 541.2.

> i.    **Logistics Coordinators' primary duty is to perform non-manual office work directly related to the general business operations of R&R.**

To qualify for the exemption, an employee's "primary duty" must be the performance of exempt work.  Primary duty is defined by the interpretative regulations as "the principal, main, major or most important duty that the employee performs."  29 C.F.R. § 541.700.  The primary duty of logistics coordinators, as the name suggests, is coordination between shippers and transporters and acting as a consultant to customers with shipping needs, this is a multi-faceted

---

[13]  The Pennsylvania Minimum Wage Act contains an analogous exemption and R&R requests that the Court review the two in accord with one another.  43 P.S. § 333.105(a)(5).

and complex series of interactions.  Doc. No. 140-8 at pp. 62, 63-65, 140-10 at 45, 53-54, 57 and

140-02 at pp. 84 -86).  Plaintiff would have the court believe that because logistics coordinators

occasionally made sales calls, they do not meet this requirement.  This is simply inaccurate both

in terms of statutory application and analysis of the facts in this case.  First, for the reasons set

forth below, logistics coordinator positions are not as simple as picking up the phone and selling

a product.  Second, as language of the exemption mandates, the Court is to look at the "primary

duty" of the employee. If logistics coordinators occasionally placed sales calls, this is not

determinative on the categorization of logistics coordinators' primary duties.

The second aspect of prong two necessitates examination of the phrase: "office or non-

manual work directly related to the management or general business operations of the employer or

the employer's customer."  Interpretative guideline 29 C.F.R. § 541.201 clarifies this language as

follows: "an employee must perform work directly related to assisting with the running or

servicing of the business, as distinguished, for example, from working on a manufacturing

production line or selling a product in a retail or service establishment."  The logistics coordinator

position consists of office work related to the general business operations of R&R, namely

providing logistics services to clients.  Logistics coordinators are not working on a manufacturing

production line or selling a product.  Logistics coordinators are coordinating the shipping needs of

R&R's clients with transportation services. Exhibit A. Logistics coordinators utilize R&R's

technological and other resources to perform this task.  Doc. No. 140-1 at pp. 164-165.  In other

words, logistics coordinators assist with the running and servicing of R&R.

Further, the administrative exemption makes a distinction between blue collar and white

collar employees.  *See* 29 C.F.R. § 541.3 (the administrative exemption does not apply to "manual

laborers or other 'blue collar' workers who perform work involving repetitive operations with their

hands, physical skill and energy."). In determining whether logistics coordinators fall in the "blue collar" category or the "white collar" category, it is clear that they fall within the "white collar" category, which is the category of employees for which the exemption was intended to apply. This is because logistics coordinators do not perform manual labor, do not work on a production line, do not produce a product, do not sell a product, and do not perform repetitive operations with their hands, physical skill and energy. Exhibit B.

The Third Circuit decision in *Smith v. Johnson and Johnson*, 593 F.3d 280 (3d Cir. 2010) is instructive. In *Smith*, the plaintiff worked as an outside pharmaceutical sales representative, focusing on marketing the drug Coventra to physicians. Johnson and Johnson ("J&J") provided Ms. Smith with a list of target doctors and directed her to visit ten per day. J&J required Ms. Smith to visit each physician on her list once each quarter. Separately, J&J identified high priority doctors, which Ms. Smith was supposed to visit more than once a quarter. J&J provided Ms. Smith with a script and visual aids, which she was required to use. Notably, apart from these requirements, Ms. Smith was unsupervised 95% of the time and had the ability to work the way she wanted to work. *Smith*, 593 F.3d at 282-83. In sum, Ms. Smith had the discretion and autonomy to perform her primary job duties on her own accord.

Ms. Smith sued J&J seeking overtime pay under the FLSA. J&J alternately contended it was not required to pay Ms. Smith overtime under the outside sales and administrative employee exemptions. The district court declined to apply the outside sales exemption, but found that Ms. Smith fell within the administrative employee exemption. *Smith*, 593 F.3d at 283. The Third Circuit affirmed, finding significant Ms. Smith's autonomy, which required her to develop a plan to maximize sales in her assigned territory. Here, logistics coordinators possessed more autonomy and responsibility than Ms. Smith. They direct their work without direct oversight. Applying the

*Smith* holding, compels the conclusion that logistics coordinators, like Ms. Smith, fall within administrative employee exemption.

Plaintiff's counsel relies heavily on the Third Circuit decision in *Martin v. Cooper Electric Supply Co.*, 940 F.2d 896 (3ʳᵈ Cir. 1991).  The *Cooper Electric* case is entirely distinguishable, and in fact, serves to highlight why R&R qualifies for the exemption.[14]  The court in *Cooper Electric* focused on the production versus administration dichotomy (production not qualifying for the exemption and administration qualifying for the exemption).  The employer in *Cooper Electric* was a wholesaler of electrical products.  The employees at issue were inside salespersons who spent the majority of their time making sales calls.  The parties in *Cooper Electric* stipulated to the employers business being defined as "the sale of electrical products" with a primary business purposes of "producing sales of electrical products."  Because the purpose of the company was to "produce sales" inside salesmen fell on the production side as their objective was to *produce sales.*

Logistics coordinators are not akin to inside sales persons in a wholesale business who simply make sales calls.  They don't read scripts or prepared statements, to the contrary, they develop their own techniques to assess shipping needs and devise unique shipping solutions.  *See* Exhibit A.  Their work falls into the category of "running or servicing a business" as opposed to "working on a manufacturing line or selling a product."  Logistics coordinators identify unique distribution challenges (e.g., time constraints, requests for visibility, tracking and tracing, costs) and they develop ways to meet those challenges.  *Id.*  For example, a logistics coordinator may be working with a farm producing eggs and would need to develop solutions to meet the farm's needs

---

[14] The other cases cited by Plaintiff are likewise distinguishable. *See Reiseck v. Universal Communications of Miami, Inc.*, 591 F.3d 101 (2ⁿᵈ Cir. 2010), *abrogated by Flood v. Just Energy Marketing Corp.*, 904 F.3d 219 (2ⁿᵈ Cir. 2018) (abrogated on the grounds that the grounds that *Reiseck* construed the administrative exemption narrowly in violation of *Encino Motorcars, LLC v. Navarro*, 138 S.Ct. 1134, 1143 (2018)); *see also McKeen-Chaplin v. Provident Savings Bank*, 862 F.3d 847 (9ᵗʰ Cir. 2017) (mortgage underwriters implemented guidelines designed by management, were required to ask for permission when deviating from protocol).

in transporting the cargo.  Exhibit B.  By way of another example, a logistics coordinator identified a pipe customer in an area of high demand for flatbed trailers.  *Id.*  The logistics coordinator sourced customized equipment in the form of trays to allow the shipper to load their freight with an overhead crane, slide the tray into a van trailer, and ship the van by rail to destinations.  *Id.* These are just two examples of the many challenges logistics coordinators face.  The primary duty of logistics coordinators is not sales calls, and the logistics coordinator's duties are not analogous to selling electrical products for a manufacturer.  Plaintiff's reference to *Cooper Electric* should be rejected in its entirety.

> ii.   **Logistics coordinators exercise discretion and independent judgment with respect to matters of significance.**

On its face, the third prong is relatively straightforward, "an employee whose primary duty includes the exercise of discretion and independent judgment with respect to matters of significance."  The interpretative regulations clarify that the exercise of discretion and independent judgment "involves the comparison and the evaluation of possible course of conduct, and acting or making a decision after the various possibilities have been considered."  29 C.F.R. § 541.202(a). Factors to consider include: whether the employee has authority to formulate, affect, interpret or implement management policies or operating practices; whether the employee carries out major assignments in conducting the operations of the business, whether the employee performs work that affects business operations to a substantial degree, etc.  29 C.F.R. § 541.202(b).  The exercise of discretion and independent judgment "implies that the employee has authority to make an independent choice, free from immediate direction or supervision."  29 C.F.R. § 541.202(c).

In *Verkuilen v. Mediabank, LLC*, 646 F.3d 979 (7th Cir. 2011), the Seventh Circuit elucidated a thoughtful analysis as to the purpose behind this prong:

> [O]ne sees what the regulation is getting at: a legal requirement to
> pay a worker a fixed percentage increase in his hourly wage if he

> works more than 40 hours a week doesn't fit a worker who spends
> much of his work time off the employer's premises, where he can't
> be supervised and so if entitled to overtime would be tempted to
> inflate his hours.
>
> The danger is acute if, as the regulation also requires, the work
> involves the exercise of independent judgment relating to
> management or general business operations.

*Id.* at p. 981.  In *Verkuilen*, the plaintiff was employed as an account manager for the employer

who provided computer software to advertising agencies.  The plaintiff acted as "a bridge" between

the software developers and the customers, helping to determine the customers' needs, then

relaying those needs to the developers and assisting in the customization of the software.  *Id.*  The

plaintiff would utilize complex software that could be customized to the needs of the client, which

varied.  *Id.*  The court in *Verkuilen* concluded that the plaintiff was a "picture perfect example of

a worker for whom the Act's overtime provision is not intended."  *Id.*  The plaintiff was not a

"salesman for Best Buy or a technician sitting at a phone bank fielding random calls from her

employer's customers- instead she's on the customer's speed dial during the testing and operation

of the customer's [software]."  *Id.* at p. 982.  The plaintiff was "identifying customers' needs,

translating them into specifications to be implemented by the developers, assisting the customers

in implementing the solutions…"  *Id.*  The court categorized the plaintiff in *Verkuilen* into the

advisor or consultant category, which is specifically exempt pursuant to Section 541.201(c) of the

interpretative regulations  *Id.*

*Verkuilen* is entirely analogous to logistics coordinators.  Logistics coordinators are the

bridge between the shippers and the transportation companies, logistics coordinators determine the

needs of the shippers, and they relay those needs and assist in the customization of the

transportation solution.  Logistics coordinators use the tools provided by R&R, including software

technology, to customize a transportation solution to the needs of the client, which varies.

14

Logistics coordinators identify the shipper's needs, find solutions to fit those needs, negotiate contracts between the shipper and the transporter, set/agree to contract price and assist the two in carrying out the shipment.  *See* Exhibits A and B.  Logistics coordinators carry out their duties with hours that they determine, at a pace that they determine, from a location that they determine, and without oversight from R&R.  *See* Exhibit A, ¶ 9; *see also* Doc. No. 140-26 at pp. 76-77.

The 3PL logistics services provided by R&R are an integral part of the supply chain. Through the skillful work of its logistics coordinators, R&R supplies its customers with specific need-centered, comprehensive transportation solutions. *See* Exhibit A. Logistics coordinators use a host of resources to design and provide customers with solutions that are limited only by logistics coordinator's resourcefulness and imagination.  *Id.*  They create logistics/transportation products that work for each customer on the day the specific transportation need arises.  *Id.*  Logistic coordinators are free to use one resource or any combination of resources, *i.e.*, truck, rail and ship, drayage or warehouse services to fill the unique logistics/transportation needs at issue.  *Id.*  They decide when to use international, dedicated or LTL freight resources to meet the customers' needs.[15]

Once trained, Logistics coordinators work autonomously, with no supervisory oversight and possessing complete discretion and no supervisory oversight regarding every aspect of their job.  *See* Exhibits A and B.  They develop and manage their own business plans.  They build their own contacts and decide whom to identify and contact – at both ends of the supply chain – to develop their book of business.  *Id.*  They select the services and resources they decide are appropriate for the solution they design for the customers' individualized need.  *Id.*  They alone negotiate price and terms with both shippers and transportation companies.  *Id.* Once the

---

[15]  Doc. No. 140-1 at pp. 18, 32-33, 34, 36.

customers' product is in motion, the Logistics coordinators tracks the load throughout the logistics and transportation process.   They intervene when problems arise serving as the customer's decision-maker.  *Id.*

Neither the FLSA nor the applicable Regulation defines "logistics coordinator."  R&R submits respectfully that the Court must read the phrase "logistics coordinator" in the context of the FLSA exemption at issue and interpret the logistics coordinator job description by considering the descriptive deposition testimony provided by LCs and applying the ordinary meaning of the words "logistics" and "coordinator."  *Encino Motorcars, LLC v. Navarro*, 138 S. Ct. 1134, 1140 (2018); *Taniguchi v. Kan Pacific Saipan, Ltd.*, 566 U.S. 560, 566 (2012).

In the transportation context, the ordinary meaning of logistics is "the commercial activity of transporting goods to customers."  *See* https://en.oxforddictionaries.com/definition/logistics. The ordinary meaning of coordinator is "a person whose job is to organize events or activities and to negotiate with others in order to ensure they work together effectively." *See* https://en.oxforddictionaries.com/definition/coordinator.  Although not part of the FLSA the Consumer Product Safety Act ("CPSA"), 15 U.S.C. § 2051, *et seq.*, defines a "third party logistics provider" as "a person who transports a consumer product in the ordinary course of business but who does not take title to the product."  15 U.S.C. § 2052.  Logistics coordinators do precisely that.

For each R&R customer, Logistics coordinators' task is to make decisions regarding every aspect involved in moving the subject product through the supply chain to the desired end destination.   Although Logistics coordinators do not take title to customers' products, they shepherd the products through the supply chain.  Every aspect of a Logistics coordinators' job

demonstrates the broad scope of their discretion and autonomy and illustrates the significance of the role they fill in R&R's 3PL business.

### iii. Logistics coordinators' compensation exceeded $455.00 per week and should be viewed as compensation on a "salary basis."

#### a. Logistics coordinators' pay exceeded $455.00 per week.

Plaintiff did not argue that the $455.00 weekly minimum was not met.  The evidence of record consists of paycheck details for the twenty class members during the specified class period.[16]  The class member's paychecks establish that eleven class members were at all times paid more than $455.00 per week.  *See* Doc. Nos. 140-15 to 140-18.  Of the remaining nine class members, individualized analysis is required to assess whether their salaries met the $455.00 per week threshold.  *See Hofer v. Federal Cartridge Corp.*, 71 F. Supp. 243 (D. Minn. 1947) (registered nurses were exempt for every month where their weekly salary exceeded more than the minimum, but not as to the months where their salary totaled less than the minimum).  This is especially true due to the nature of the pay structure associated with the logistics coordinator position.

Looking at the details, the following is established:

- All Logistics coordinators were paid a minimum of $455.00 during 2014. Doc. No. 140-15;

- John Zehe left the Pittsburgh area and ultimately abandoned his job due to a family medical emergency.  As a result of this circumstance, there were several weeks in which the payments to Mr. Zehe appear to have fallen below under the $455.00 threshold.  These payments should be disregarded.  Exhibit B.

- Joshua Sickenberger was at all times paid $800.00 per week.  His last paycheck was in the amount of $160.00, however, this last pay period should be excluded from consideration as it represents a

---

[16]  Ten individuals have opted-out of the class.  There are no class members who were employed during 2014.  The only two logistics coordinators employed during 2014 were Shawn Laverty and John Teitz, both of whom have opted out of the class.

terminal week of work.  Doc. No. 140-18, p. 14; *see* 29 C.F.R. §
541.602(6).

- David Miller should be excluded as he did not make it out of the
  training phase, was at all times paid $20.00 per hour, and he did not
  work any overtime.  *See* Exhibit No. 18, p. 9.

- Jason Kneller should be excluded.  He has signed a late opt-out to
  this litigation.[17]

- The following individuals have opted-out of this litigation: Maxwell
  Curley, Bryan Jackson, John Krakowski, Robert Larimer, Shawn
  Laverty, Josh Rulnick, Ben Shelton, Thomas Stinson and Jason
  Ryan Teitz. Doc. Nos. 140-15 to 140-18.

- The following individuals were at all times paid in excess of $455.00
  per week: Naggy, Tressler, Delesandro, Miller, Terrick, Zangaro,
  Hall, Szlachta, Thuer, Vasquez, and Kehr. These individuals should
  be excluded.  Doc. Nos. 140-15 to 140-18.

After the time periods and individuals noted above are excluded from the analysis, there
are fourteen weeks where a logistics coordinator was paid less than $455.00 per week (four weekly
periods for Michael Bradshaw; three weekly periods for Corey Riley; six weekly periods for Shane
Rhodes, one weekly period for Ben Rood (Mr. Rood should be excluded for other reasons as set
forth below).  Doc. Nos. 140-15 to 140-18. The Court should apply the legal principle of *de
minimis non curat lex*, or "the law does not concern itself with trifles" and disregard these
payments. Alternatively, if the Court does not apply the *de minimis* principle, a question of fact
exists with regard to whether these individuals were working during the weeks where they were
paid less than $455.00, or whether these individuals may have been on vacation, sick, or otherwise
not attending work.

---

[17]  In 2015, R&R paid Mr. Kneller $61,470.45 for forty-three weeks of work.  R&R paid Mr. Kneller $447.50 for
the September 18, 2015 pay period ($ 7.50 below the $ 455.00 minimum).  Mr. Kneller's pay otherwise fell within
the range of $ 588.75 to $ 6,563.35 per week**.**  Doc. No. 140-16.

As is noted above, the vast majority of the class *was* paid more than $455.00 per week at all times. Accordingly, R&R requests that the Court find that the first prong of the administrative exemption test has been satisfied.

> b.     *Logistics Coordinator's compensation schedule was intended to reflect a minimum salary, and in practice, resulted in Logistics Coordinators being compensated in excess of the $455.00 per week.*

Plaintiff's argument that logistics coordinators were not paid on a "salary or fee basis" is an oversimplification of the rather unique compensation structure in place for logistics coordinators. The fee structure was based on the overarching principle that logistics coordinators should be in a position to earn, at minimum, $800.00 per week, well in excess of the $455.00 minimum. Exhibit A. To that end, Mr. Francis described that logistics coordinators would be paid a base salary of $800.00 upon commencing employment with R&R. *Id.* Thereafter, logistics coordinators who were earning more than the $800.00 per week were transferred to a commission basis, but only after it was virtually guaranteed that their weekly pay would exceed the $800.00. Doc. No. 140-1 at pp. 73-74. No logistics coordinator was forced off of the $800.00 per week and the decision to move from $800.00 per week was mutual and at the request of the logistics coordinator. Exhibit B.

Many logistics coordinators who were employed during the relevant period did not move from the $800.00 per week salary (or were paid a base salary either meeting or exceeding $800.00 plus commissions), and therefore, Plaintiff's argument regarding "salary or fee basis" flatly fails. The individuals who received, at least, an $800.00 per week salary are: Curley,[18] Zangaro,

---

[18] Mr. Curley was employed in 2017. He was paid a salary of $650.00 per week. *See* Doc. No. 140-18.

Vasquez, Tressler, Thuer, Shelton, Sickenberger, Stinson, Rulnick, Naggy, Laverty, Krakowski, Hall.[19]

Plaintiff argues that 29 C.F.R. § 541.602 provides a rigid framework for assessing whether an employer's pay structure is on a "salary basis."[20]  The language of the interpretative regulation does not bear that out.  Notably, this section is prefaced by the phrase "General rule."  *Id.* at (a).  Further, the statute allows for a "window of correction" which allows an employer to make a yearly payment to the employee to achieve the required level.  *See Davis v. City of Hollywood*, 120 F.3d 1178 (11th Cir. 1997).   The regulation also provides for numerous exceptions allowing for reductions in pay for absences for one or more full day due to personal reasons, absences for illness or disability under certain circumstances, jury duty, disciplinary suspensions, etc.  The Court should find that the R&R pay structure was akin to a "salary basis" given the progressive step-up compensation policy in place for logistics coordinators.

iv.    **Judgment in favor of R&R and against Ben Rood is proper.**

Mr. Rood met the definition of the administrative exemption, and the Court should dismiss Mr. Rood's claims and hold that he is not a proper representative of the putative class.  Mr. Rood became employed as a logistics coordinator on May 31, 2016.  Doc. No. 1, p. 2, ¶ 9.  He made $800.00 per week until the end of January/beginning of February.  Once he transitioned from the $800.00 per week he earned $37,438.13 over a period of 34 weeks, which is an average of $1,404.12 per week. Doc. Nos. 140-15 and 140-16.

There are two weeks where Mr. Rood earned less than $455.00 per week, one of those weeks is after his last day of work, which is per the statute permitted to represent a partial payment.

---

[19]  The inherent differences between the groups of class members (opt-outs, paid more than $455.00 per week, and paid a salary) underscore the lack of commonality between the putative class members.

[20]  Excluding the individuals listed in the aforementioned paragraph, as well as the opt-outs, Plaintiff's analysis as to the salary basis applies to the following: Bradshaw, Fallon, Kehr, Miller, Ray, Reilly, Rhodes, Rood.

29 C.F.R. § 541.602(6) ("An employer is not required to pay the full salary in the initial or terminal week of employment.").  In one other week he earned $430.07.  The regulations interpreting "salary basis" allows for flexibility.  *See* 29 C.F.R. § 541.603(e) ("This section shall not be construed in an unduly technical manner so as to defeat the exemption.").  Per the regulations, an employer is permitted to take advantage of a "corrective window" whereby an employer can adjust the employee's compensation to achieve the requisite level of pay.  Courts have found compliance with the $455.00 salary requirement where deductions were made on isolated occasions.  *See Baudin v.Courtesy Litho Arts, Inc.*, 24 F.Supp.2d 887 (N.D. Ill. 1998) (noting that one pay period where the plaintiff fell below his weekly salary was perhaps "simply a clerical error" and further that a "single deduction from [the employee's paycheck] does not remove him from the category of employees paid "on a salary basis").

Based on the above analysis, Mr. Rood is not an appropriate representative of the class whose claims he wishes to litigate.  He does not possess the same interests, and he has not suffered the same injury as the putative class members.  *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338 (2011).  Accordingly, the class allegations fail for lack of appropriate representation of the named Plaintiffs, Mr. Rood.

> **v.    The Logistics Coordinator Handbook is not a relevant consideration.**

Class counsel has argued that logistics coordinators cannot be exempt under the administrative employee exemption as the logistics coordinators executed an "Employee Sales Representative Agreement" ("ESR").  This position is an argument of necessity, and such an overly simplistic analysis of the administrative exemption is proscribed by the interpretative regulations.  29 C.F.R. § 541.2.  Indeed, the regulations make clear that the "exempt or nonexempt status of any particular employee must be determined on the basis of whether the employee's salary and duties meet the requirements of the regulations." *Id.*; *see also Robinson-Smith v. Government*

*Employees Ins. Co.*, 323 F.Supp.2d 12, *reversed and remanded on other grounds* 590 F.3d 886 (D.C. 2010) (job title is not dispositive as to whether an employee's work is related to management policies or general business operations). For these reasons, the Court should disregard counsel's arguments that the ESR is dispositive as to the issue of the administrative exemption.

**C.**   **Logistics coordinators fall within the retail or service establishment exception.**

Plaintiff has advanced the position that logistics coordinators were inside sales people, for the reasons set forth above, R&R asserts that logistics coordinators were administrative employees. However, as an alternative argument, logistics coordinators satisfy the elements necessary for application of the retail or service exemption. The FLSA exempts employees of a retail or service establishment if (1) the employee works in a retail or service establishment; (2) the regular rate of pay for such employees is in excess of one and one-half times the minimum hourly rate; (3) more than half of the employee's compensation for a representative period represents commissions on goods or services. 29 U.S.C. § 207(i).

The Department of Labor recently withdrew two provisions relevant to the retail or service establishment exemption which detailed industries the DOL viewed as either having no retail concept, or potentially being recognized as retail. Rather than consulting a list, the Court should apply the test set forth at 29 C.F.R. § 779.313, namely that to qualify as a "retail or service establishment" the business must: (1) engage in the making of sales of goods or services; (2) 75 percent of its sales of goods, or services, or both must be recognized as retail in the particular industry; (3) not over 25 percent of its sales of goods or services, or of both, may be sales for resale. While there is a dearth of case law post-exemption list withdrawal, there are notable Department of Labor Opinion Letters authored on the subject. These Opinion Letters are discussed more fully below.

The DOL's overhaul of the retail/service exemption is consistent with the Supreme Court's directive in *Encino Motorcars, LLC v. Navarro*, *supra*. In *Encino*, the Court was interpreting a different exemption; however, the Court firmly stated that the exemptions to the FLSA should *not* be construed narrowly. This is because the FLSA gives no "textual indication" that its exemptions should be construed narrowly, and "there is no reason to give [them] anything other than a fair (rather than a 'narrow') interpretation." *Id.* (internal citations omitted). The Court further noted that the "narrow" interpretation principle "relied on the flawed premises that that FLSA 'pursues' its remedial purpose 'at all costs.'" *Id.* (internal citations omitted). The Court concluded this analysis by noting that the exemptions themselves were as much a part of the law as the overtime requirement, and therefore, deserved the same fair reading. *Id.* In accordance with the Supreme Court's directive in *Encino*, this Honorable Court must give the retail/service exemption a fair interpretation.[21]

i.   **R&R is a retail or service establishment.**

This Court's interpretation of the retail/service exemption should be guided by the DOL's Opinion Letter FLSA2020-11 dated August 31, 2020. A copy of the Opinion Letter is attached for the Court's convenience as Exhibit C. In the Opinion Letter, the DOL was asked to opine as to whether a private oilfield service company that provides waste-removal services for oilfield operators qualifies as a retail or service establishment. Oilfield operators removed waste from customers' oil well locations and transported the waste to disposal facilities. This satisfied the "sales of goods or services" requirement. Further, the fact that the client was selling waste removal services to commercial entities did not change the conclusion. *Id.* Per the DOL, if a particular business' services are recognized in the industry as retail, then it follows that the business meets

---

[21]  This fair reading principle is equally applicable to the administrative employee exemption, discussed above.

the "recognized as retail" requirement.  *See* DOL Opinion Letter Exhibit C.  The services provided by R&R are recognized as retail services within the logistics industry.  Exhibit B.

In order to qualify for the exemption, the business also needs to have a "retail concept," indicia of which *typically* includes: sale of goods or services to the general public; servicing the everyday needs of the community; the business is at the very end of the stream of distribution; the business disposes in small quantities of its products or skills; and the business does not take part in the manufacturing process.  *Id.* citing 29 C.F.R. § 779.318(a).  Industries previously listed as lacking a retail concept by the DOL may now qualify for the exemption.  Exhibit C.

The DOL provided further guidance regarding this exemption by way of DOL Opinion Letter FLSA 2021-6 dated January 19, 2021.  Exhibit D.  In the letter, a trade association comprised of member staffing firms requested an opinion as to whether the "retail or service establishment" exemption applies to staffing firms that recruit, hire, and place employees on temporary assignments with clients.  The DOL examined the criteria for a retail concept as follows: (1) recruitment services were provided to business in the general public which may serve the employment needs of the community in which they are located; (2) placement of a worker with a business is the "end of the stream of distribution" for recruitment services; (3) staffing firms do not typically place workers "in bulk"; and (4) staffing firms do not engage in manufacturing.  The DOL has painted a clear picture that with the elimination of the list of industries that do not qualify as a "retail or service establishment" the DOL has implemented a broad approach to assessing these criteria.  It is significant that the DOL interpreted the "end of the stream of distribution" as an industry specific inquiry, as opposed to viewing the concept in the traditional sense where the "end of the stream of distribution" is providing the good/service to the consumer.

A fair reading of the DOL opinion letters places R&R squarely within the retail or service exception.  First, Defendant provides services to the general public, the DOL letters have noted that the distinction between commercial and non-commercial is not appropriate.  R&R provides transportation and shipping solutions to customers of all types and sizes.  R&R provides transportation and shipping solutions to the community in which R&R is located, and the communities in which its customers are located.  R&R's industry is transportation and logistics, the "end of the stream of distribution" for the transportation and logistics industry is delivery of the product.  R&R does not provide services "in bulk" as each shipment is tailored to the needs of the particular client on that particular occasion.  Finally, R&R does not engage in manufacturing.

Regarding the requirement that 75% of the company's goods or services be recognized as retail and not more than 25% be sales for resale, this element is easily satisfied.  100% of the services provided by logistics coordinators of R&R are recognized as retail services within the industry.  R&R does not engage in any "resale."  Exhibit B.

ii.    **Compensation to logistics coordinators exceeds 1 ½ times the federal minimum wage.**

The second prong of the retail or service exemption is that the employee's compensation exceeds 1½ times the federal minimum wage.  The federal minimum wage is $7.25/hour, 1½ times the minimum wage equals $10.875 per hour.  R&R incorporates by reference the analysis of logistic coordinators' compensation set forth above in Subparagraph (B)(iii).  This subsection contains an examination of how the logistics coordinators salaries met the $455.00 per week minimum for application of the administrative employee exemption.  It therefore follows that logistics coordinator's compensation meets the 1½ times the federal minimum wage test which is less than $455.00 per week based on a 40-hour work week.

> iii.    **More than half of the employee's compensation for a representative period represents commissions on services.**

As is discussed above, compensation to logistics coordinators who have transitioned from a training phase is commission based when a logistics coordinator can sustain a floor, or minimum compensation per week.  Accordingly, R&R satisfies this element.

**D.    R&R exhibited a good faith effort to comply with the FLSA.**

For the reasons set forth above, R&R is entitled to summary judgment in its favor with regard to the administrative employee exemption and/or retail and service exemption.  In the alternative, R&R has presented material issues of fact which preclude summary judgment in favor of the Plaintiff class.  Assuming arguendo, that the Court were inclined to grant the Plaintiff class' motion for summary judgment, in whole or in part, and determine that R&R misclassified some or all of the logistics coordinators, R&R would be entitled to the good faith defense.

If an employer can show good faith and reasonable grounds for believing that the employer was not in violation of the FLSA, liquidated damages are not warranted.  29 U.S.C. § 260.  The Portal-to-Portal Act amended the FLSA to provide employers with a defense to the FLSA's mandatory liquidated damages provision: "if the employer shows to the satisfaction of the court that the act or omission giving rise to such action was in good faith and that he had reasonable grounds for believing that this act or omission was not a violation of the [FLSA] the court may, in its sound discretion, award no liquidated damages…"  The good faith defense has been interpreted as a two-fold inquiry with a subjective and objective analysis of the employer's actions.  The employer must have an honest intention to ascertain and follow the law (subjective) and the employer's position must be reasonable (objective).  *Williams v. Tri-County Growers, Inc.*, 747 F.2d 121 (3rd Cir. 1984).

The good faith defense is wholly applicable in this case.  As is demonstrated from the analysis above, the question of whether logistics coordinators qualify as non-exempt under either the administrative exemption or the retail or service exemption is a complex inquiry, for which there is no specific legislative or regulatory guidance, nor has the issue previously been considered by the courts.  R&R hired a human resources professional whom R&R reasonably relied upon for advice.  Doc. No. 140-1, pp. 55.  R&R was not advised by its human resources professional that the logistics coordinators could be considered non-exempt employees.  *See id.* at p. 69.  Further, given the autonomy afforded to logistics coordinators, as well as their generous salaries, R&R was objectively reasonable, and subjectively believed that logistics coordinators were properly classified as exempt administrative employees.

**E.**     **Treating logistics coordinators as exempt is consistent with the FLSA's structure and broader purposes.**

Treating logistics coordinators as exempt comports with the context of the broader statutory scheme of the FLSA and the broader scheme of R&R's 3PL business.  *See Sturgeon v. Frost*, 136 S. Ct. 1061, 1070 (2016) (deeming it "fundamental" that "the words of a statute must be read in their context and with a view to their place in the overall statutory scheme").  The FLSA contains many provisions designed to exempt from the overtime rules individuals paid on a commission basis.  *See, e.g.,* 29 U.S.C. §§ 207(i), 213(a)(1), 213(b)(10)(A).  Those exemptions reflect the basic reality that commissioned employees, "are more concerned with their total work product than with the hours performed."  *Brennan v. Deel Motors*, 475 F.2d 1095, 1097 (5th Cir. 1973).  Forcing R&R to pay overtime to its logistics coordinators would be a misguided attempt to fit a square peg into a round hole.  Salespeople are "hardly the kind of employees that the FLSA was intended to protect."  *Christopher v. SmithKline Beecham*, 567 U.S. 142, 166 (2012).  While

logistics coordinators are not salespeople in the traditional sense, this aspect of *Christopher* is equally applicable here.

The exemptions reflect the basic reality that it is both common and reasonable for an employer to compensate employees based on their talent and *productivity* rather than their sheer number of hours worked.  As noted by logistics coordinator Drew Hall, he makes money based on his productivity.  Doc. No. 140-26 at pp. 76-77.[22]  As the Fifth Circuit has explained, "the enactment of [exemptions] was an implicit recognition by Congress of the incentive method of remuneration."  *Deel Motors*, 475 F.2d at 1098.  Although the *Deel Motors* case dealt with salesmen, partsmen and mechanics, the incentive method of remuneration analysis is equally applicable here.  Excluding logistics coordinators from the above exemptions, would do nothing to promote the policies underlying the FLSA.  *See, e.g., Christopher*, 567 U.S. at 166 (noting that commissioned pharmaceutical representatives are "hardly the kind of employees that the FLSA was intended to protect").  Forcing logistics coordinators into the FLSA's mandatory overtime scheme would not advance the core policy goals underlying the FLSA.  Indeed, logistics coordinators have unlimited earning potential and many earn six figure commissioned salaries.  In short, this is not a case that implicates the FLSA's core concern of protecting workers from "wages too low to buy the bare necessities of life."  S. Rep. No. 75-774 at 4; S. Rep. No. 75-884 at 4.

---

[22]  Significantly, on the subject of his earnings, Mr. Hall testified that he is doing very well and works on average 25 to 32 hours a week.  Mr. Hall's testimony is significant for several reasons.  First and significantly, the testimony undercuts Plaintiff's position that the work/circumstances of Logistics Coordinators are substantially similar.  They are not, rendering collective evaluation of their individualized experiences a practical impossibility.  Second, the testimony confirms that Logistics Coordinators operate autonomously – notably setting their own hours. *See* Doc. No. 140-26 at pp. 76-77.

### III.   <u>CONCLUSION</u>

For the aforementioned reasons, it is respectfully requested that this Honorable Court decertify the FLSA collective and Rule 23 class. It is further requested that the Court grant R&R's Motion for Summary Judgment and conclude that, as a matter of law, logistics coordinators are exempt employees within the administrative employee exemption which necessitates dismissal of Plaintiff's class action.

BURNS WHITE, LLC

*/s/ Samantha D. Farrell*
Ralph M. Monico, Esquire
PA I.D. No. 69633
rmmonico@burnswhite.com
Samantha D. Farrell, Esquire
PA I.D. No. 313999
sdfarrell@burnswhite.com
BURNS WHITE LLC
Burns White Center
48 26th Street
Pittsburgh, PA  15222
P: (412) 995-3152
F: (412) 995-3300
Counsel for R&R Express, Inc.

## **CERTIFICATE OF SERVICE**

The undersigned does hereby certify that on this 20th day of October, 2021, a true and correct copy of the within DEFENDANT'S OMNIBUS MOTION TO DECERTIFY CLASS, MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT IN FAVOR OF DEFENDANT, AND MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT was served via electronic mail and U.S. First Class Mail addressed as follows:

Jospeh H. Chivers, Esquire
THE EMPLOYMENT RIGHTS GROUP
100 First Avenue, Suite 650
Pittsburgh, PA  15222
jchivers@employmentrightsgroup.com

and

John R. Linkosky, Esquire
JOHN LINKOSKY & ASSOCIATES
715 Washington Avenue
Carnegie, PA  15106
linklaw@comcast.net

*/s/ Samantha D. Farrell*
Samantha D. Farrell, Esquire